IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Rudy Saxon,                            )
                                       )    Civil Action No. 6:08-1985-SB-WMC
                    Plaintiff,         )
                                       )    **REPORT OF MAGISTRATE JUDGE**
          vs.                          )
                                       )
Michael J. Astrue,                     )
Commissioner of Social Security,       )
                                       )
                    Defendant.         )
_____)

　　　　This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

　　　　The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

　　　　The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on September 3, 2004, respectively, alleging that he became unable to work on August 7, 2004. The applications were denied initially and on reconsideration by the Social Security Administration. On October 13, 2005, the

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, his attorney, his sister, and a vocational expert appeared on November 8, 2006, considered the case *de novo*, and on March 6, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on March 20, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

> (2) The claimant has not engaged in substantial gainful activity since August 7, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq.*).

> (3) The claimant has the following severe impairments: lumbar and cervical degenerative disc disease, status post left total hip replacement, and schizophrenia (20 CFR 404.1520(c) and 416.920(c)).

> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

> (5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work. Specifically, he claimant can lift and carry no more than 10 pounds at a time, sit and stand for six hours in an eight-hour workday, and walk for two hours in an eight-hour workday. The claimant has additional restrictions of a sit/stand option; occasional climbing on ramps and stairs; no climbing of ladders, scaffolds, or ropes; occasional balancing, stooping, bending, crouching, and crawling; no hazardous environment; unskilled, low-pressure work with no contact with the public.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant was born on May 8, 1959 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability date (20 CFR 404.1563 and 416.963).

(8)     The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from August 7, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.


## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389

4

(1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff, born May 8, 1959, was 45 years old on his alleged disability onset date and 47 years old at the time of the ALJ's decision.  He has a high school education (Tr. 88) and previously worked on a farm, mixing chemical fertilizer (Tr. 833).

### Medical Evidence

In 2002, the plaintiff was diagnosed with necrosis in his left hip, confirmed by an MRI, and referred to the orthopedics department at the Veterans Affairs Medical Center ("VAMC") in Charleston, South Carolina.  The plaintiff apparently did not follow up with the orthopedics department at that time.  He returned to the VAMC on June 4, 2004, again

complaining of pain in his left hip (Tr. 290). On July 19, 2004, x-rays showed aseptic necrosis with collapse of the femoral head and joint space narrowing (Tr. 284).

On October 5, 2004, the plaintiff underwent a total left hip replacement surgery at the VAMC (Tr. 133-34). One week after surgery, he could ambulate using a walker without any assistance (Tr. 167). On October 14, 2004, VAMC notes indicated that the plaintiff could perform weight-bearing activity as tolerated (Tr. 151) and was doing well in physical therapy (Tr. 153). By December 4, 2004, the plaintiff was "doing well" after his surgery, sleeping through the night, and experiencing moderate pain "only with long walking" (Tr. 480). Hospital notes during the plaintiff's recovery documented a history of alcoholism (Tr. 218, 221).

On November 22, 2004, state agency physician Dr. James Weston completed a residual functional capacity assessment, in which he opined that the plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; had limited ability to push/pull in his lower extremities; and could occasionally climb, stoop, kneel, crouch, and crawl (Tr. 294-301).

After discharge from VAMC following his hip surgery, the plaintiff participated in an outpatient substance abuse counseling program at the VAMC from December 14, 2004, through February 7, 2005 (Tr. 717). He regularly attended the group sessions and showed a moderate degree of participation. The plaintiff concurrently attended Alcoholics Anonymous meetings (Tr. 312). Throughout the treatment program, the plaintiff abstained from all mood-altering substances, as confirmed by breathalyzer and urine testing (Tr. 312, 575, 591, 717, 763-96).

On December 14, 2004, a mental status examination found the plaintiff's thought process goal-directed, his thought content normal, and delusions and hallucinations

absent. The notes also indicated that the plaintiff's cognitive functions were impaired (Tr. 459-60).

On December 29, 2004, the plaintiff reported that he occasionally hears voices, usually just calling his name, not commanding him; he indicated that these symptoms have not caused him any functional impairment (Tr. 314). Dr. Robert Ruby, a psychiatrist, noted that the plaintiff showed signs suggesting schizophrenia; however, with his long history of substance abuse, Dr. Ruby indicated that he would like to see the plaintiff off all substances for a period of time before proposing a more firm diagnosis (Tr. 317). Laura Hancock, D.O., reiterated Dr. Ruby's conclusions on January 20, 2005, and prescribed buproprion to assist with mood stabilization (Tr. 571).

On January 20, 2005, Isadore Moore, vocational rehabilitation specialist, indicated on a check-off form that the plaintiff did not have the following diagnoses: post-traumatic stress disorder, anxiety disorder, affective disorder, bipolar disorder, schizophrenia, psychosis, and adjustment disorder (Tr. 559). Progress notes from January 24, 2005, indicated that the plaintiff's strengths included punctuality, getting along well with others, following instructions, working with his hands, accepting criticism, and problem solving. The plaintiff's barriers included lifting limited to 20 pounds and no bending or squatting for prolonged periods (Tr. 508). On January 27, 2005, the plaintiff reported his mood was a seven on a scale of one to ten. Denetria Norman, addiction therapist, noted that the plaintiff's thought processes were logical, linear, and connected, although his judgment and insight were limited (Tr. 593). Just prior to discharge from the substance treatment program on February 7, 2005, the plaintiff's thought processes were again recorded as logical, linear and connected (Tr. 716).

On July 28, 2005, Manhal Wieland, Ph.D., a state agency psychological consultant, completed a mental residual functional capacity assessment. Notably, Dr. Wieland did not find the plaintiff's abilities markedly limited in any functional category. He

opined that the plaintiff could attend work regularly, although occasionally missing a day due to his mental condition; relate appropriately to supervisors and coworkers; perform simple tasks for at least two hours without special supervision; and make simple work-related decisions and occupational adjustments. Dr. Wieland indicated that the plaintiff would function better in a slower-paced, lower-stress work environment and may find work with the general public to be stressful (Tr. 672-76).

On August 19, 2005, at the request of the Commissioner, the plaintiff underwent a consultative examination by Eugene Eline, Jr., D.O. Dr. Eline indicated the plaintiff had been sober for seven months and did not report any alcohol use. He found the plaintiff should "be restricted from standing for greater than 20 minutes, continuous sitting for more than 20 minutes, continuous lifting more than 20 pounds, or walking more than 20 minutes continuous." The plaintiff denied back pain and had a full range of motion in his cervical and lumbar spine, no deformities or malalignment in his cervical spine, and no tenderness to palpation in the lower back. X-rays demonstrated a well-positioned, well-aligned left total hip replacement and arthroplasty; no evidence of any loosening, subsidence, or malposition; no heterotropic ossification; symmetric limb lengths with no shortening or over lengthening. Dr. Eline commented that typically patients who have undergone a total hip replacement and arthroplasty are able to rejoin the work force. He opined that the plaintiff's "hip looks great" and noted that the plaintiff did not appear to have any complications from his hip replacement. Dr. Eline concluded that the plaintiff could engage in sedentary to light activities (Tr. 694-96).

On September 12, 2005, Dr. Robert Kukla completed a physical residual functional capacity assessment, in which he concluded that the plaintiff could occasionally lift and/or carry 20 pounds, frequently lift 10 pounds, stand and/or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday. He noted that the

8

plaintiff's medically determinable impairments warranted limiting climbing, balancing, stooping, kneeling, crouching, and crawling to occasionally (Tr. 697-704).

After a gap in treatment at the VAMC of nearly 18 months, the plaintiff sought treatment for left hip and back pain on June 14, 2006 (Tr. 705). Radiology reports indicated no evidence of hardware failure, complication, or change of status in the plaintiff's right hip (Tr. 811-12). X-rays of his back revealed no evidence of acute bony or alignment abnormality, but did show marked degenerative disc disease at L5-S1 with minimal retrolisthesis (Tr. 812). The plaintiff returned to the VAMC on August 14, 2006, at which time he reported pain in his right shoulder and neck, but indicated that his schizophrenia was not as severe even though he was not taking any medication for it (Tr. 800). X-rays of the plaintiff's right shoulder showed no fracture or other abnormalities (Tr. 810). An MRI showed marked degenerative disc disease throughout his cervical spine with moderate bilateral foraminal stenosis (Tr. 808).

The plaintiff also saw Dr. H. Biemann Othersen, III, at the VAMC Mental Health Clinic on August 14, 2006. At that time, he denied using alcohol during the previous seven months and denied using cocaine for the previous one and one-half years. He reported some paranoia in crowds and hearing voices that say "help me" two to three times per week. The plaintiff denied manic symptoms, social phobia symptoms, and panic attack symptoms. Dr. Othersen noted that the plaintiff's schizophrenic symptoms responded well to Risperidone in the past and prescribed it for him at a slightly reduced dose (Tr. 797-99).

### Plaintiff's Statements and Testimony

In a daily activities questionnaire completed October 7, 2004, the plaintiff responded that he lived alone in a mobile home; family and friends helped him with housework and shopping; he spent up to three hours per day on his hobbies, including watching television, playing the guitar, going to church, and drawing. He reported that he

was able to drive a car (Tr. 130-31). The plaintiff responded similarly to a questionnaire completed on April 6, 2005, except indicating that he did not drive and completed his own grocery shopping twice per month (Tr. 116-19). The plaintiff also indicated that he visited with friends or relatives about twice per month, either going out to eat or attending church (Tr. 118).

On July 20, 2005, the plaintiff stated that he watched television most of the day. He reported that he lived with his girlfriend and they occasionally had guests over. He stated that his memory was pretty good and answered questions appropriately without signs of unclear thinking or cognitive problems (Tr. 111).

At the hearing on November 8, 2006, the plaintiff testified that his last job involved making fertilizer and mixing chemicals and that he had not worked since hip replacement in 2004 (Tr. 833). The plaintiff reported his hip was a little better after surgery, but that it gave him problems when he tried to return to work seven weeks after surgery (Tr. 834). He indicated that his hip hurt with bending or sitting for a long period of time (Tr. 834). The plaintiff testified that he could walk 15-20 minutes before his hip began hurting and sit for about an hour (Tr. 834). He reported that he spent four to five hours lying down each day (Tr. 834). The plaintiff testified that he experienced symptoms of schizophrenia, including hearing voices off and on, seeing shadows, and finding it difficult to be around crowds (Tr. 835). He reported that he was still taking his medication, which helped with his symptoms of schizophrenia (Tr. 835).

### Vocational Testimony

Vocational expert Dr. Arthur Schmitt testified that the plaintiff's past relevant work as a chemical mixer[2] involved semi-skilled, medium exertional work (Tr. 840). The

---

[2]*Dictionary of Occupational Titles (DOT)* # 559.665-026.

ALJ asked Dr. Schmitt to assume a hypothetical person of the plaintiff's age, education level, and work experience, capable of sedentary work, needing a sit/stand option; capable of occasionally climbing ramps or stairs, but unable to climb ladders, scaffolds, or ropes; capable of occasionally balancing, stooping, bending, kneeling, crouching, or crawling; must avoid hazardous environments; and limited to low-pressure, unskilled jobs not requiring contact with the public (Tr. 840). Dr. Schmitt testified that such an individual could perform the jobs of surveillance system monitor,[3] coupon recycler,[4] and addresser[5] (Tr. 841). Dr. Schmitt indicated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and to the extent not consistent, his answers were based on his experience as a vocational expert (Tr. 841).

## ANALYSIS

The plaintiff alleges disability commencing August 7, 2004. He was 45 years old on his alleged disability onset date and 47 years old at the time of the ALJ's decision. He has a high school education and previous work experience on a farm, mixing chemical fertilizer. The ALJ found that the plaintiff had the following severe impairments: lumbar and cervical degenerative disc disease, status post left total hip replacement, and schizophrenia (Tr. 16). The ALJ further found that the plaintiff had the residual functional capacity ("RFC") to perform sedentary work. Specifically, the ALJ found the plaintiff can lift and carry no more than 10 pounds at a time, sit and stand for six hours in an eight-hour workday, and walk for two hours in an eight-hour workday. The plaintiff has additional restrictions of a sit/stand option; occasional climbing on ramps and stairs; no climbing of ladders, scaffolds,

---

[3]*DOT* # 379.367-010.

[4]*DOT* # 290.587-010.

[5]*DOT* # 209.587-010.

or ropes; occasional balancing, stooping, bending, crouching, and crawling; no hazardous environment; unskilled, low-pressure work with no contact with the public.

The plaintiff argues that the ALJ erred by failing to consider his impairments in combination. In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

This court finds that the plaintiff's allegation of error is without merit. The ALJ comprehensively reviewed all the evidence, specifically considering the plaintiff's impairments under Listing sections 1.02 (Major Dysfunction of a Joint), 1.04 (Disorders of the Spine), and 12.03 (Schizophrenia, Paranoid and Other Psychotic Disorders), and concluded that the plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" (Tr. 17). The regulations provide that when no single impairment meets a listing, the Commissioner will "compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing." 20 C.F.R. §§ 404.1526(b)(3), 416.1526(b)(3). Social Security Ruling (SSR) 96-6p requires the ALJ to receive expert medical testimony on the issue of listing equivalence; however, it specifically provides that a Disability Determination and Transmittal Form or Psychiatric

Review Technique Form signed by a state agency medical or psychological expert satisfies the requirement to receive expert medical opinion on equivalency. SSR 96-6P, 1996 WL 374180, *3 ("The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."). At both the initial and reconsideration phases in the plaintiff's case, state agency physicians completed and signed the Disability Determination and Transmittal form indicating that multiple impairments were considered in combination (Tr. 23, 24). Also, state agency psychologist Dr. Wieland completed a Psychiatric Review Technique Form on July 28, 2005, finding that the plaintiff's combined impairments did not meet or equal a listing (*see* Tr. 677-90).

Importantly, as argued by the defendant, the plaintiff bears the burden of proving his disability through step four of the sequential evaluation process. *See Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000) (holding residual functional capacity is determined at step four, where the burden of proof rests on the claimant). To show that his impairments are "equivalent" to a listing, the plaintiff must "present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *see also* SSR 83-19, 1983 WL 31248, *2 (a claimant's impairments equal a listing only if the objective medical findings are at least equal in severity to the most similar listed impairment). Here, the plaintiff failed to make the required showing.

Further, the ALJ considered the combined effect of the plaintiff's impairments in reaching his residual functional capacity determination (Tr. 17-20). The ALJ assessed the medical evidence and the plaintiff's statements regarding his hip replacement, back pain, substance abuse, and schizophrenia to articulate his residual functional capacity

13

finding (Tr. 19-20). Based on the plaintiff's degenerative disc disease and hip replacement, the ALJ found the plaintiff exertionally limited to sedentary work, with a sit/stand option, and limited stooping, bending, or crawling (Tr. 20). Likewise, he provided appropriate limitations that accommodated the medical evidence regarding the plaintiff's mental functioning – limiting the plaintiff to unskilled low pressure work involving no contact with the public (Tr. 20). Throughout his decision, the ALJ repeatedly stated that he had considered the "entire record," "all the evidence," and "the evidence as a whole" (Tr. 14, 17, 18, 20). The plaintiff points to no specific evidence or limitation that he believes the ALJ failed to incorporate. *See Smith v. Astrue*, C.A. No. 5:07-794, 2009 WL 899419, *7 (S.D. W. Va. 2009) (finding ALJ appropriately considered the plaintiff's combination of impairments and noting that the plaintiff failed to point to any specific evidence or limitation that the ALJ failed to consider). Furthermore, the ALJ incorporated the plaintiff's limitations from all his impairments in the hypothetical question to the vocational expert (Tr. 840). *See id.*

The ALJ considered each of the plaintiff's severe and non-severe impairments and assessed residual functional capacity limitations to accommodate the combined effect of the plaintiff's impairments. Accordingly, this claim of error fails. *See Gooch v. Sec'y of Health & Human Servs*., 833 F.2d 589, 591-92 (6th Cir. 1987) (finding the ALJ sufficiently considered the combination of impairments where each element of the record was discussed individually in the determination; requiring more would be unreasonable); *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992) (finding the ALJ sufficiently considered claimant's combined impairments where he discussed the claimant's physical impairments, mental impairments, complaints of pain, and daily activity levels); *Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (court found nothing to suggest that the ALJ erred in considering the combination of impairments where the opinion addressed each of the various impairments).

Substantial evidence supports the ALJ's decision in this case. The plaintiff takes issue with the defendant's contention that no physician placed significant restrictions on the plaintiff's physical activities. The plaintiff argues, "[T]he Commissioner must not have seen the report of Dr. Eugene Eline, the examiner who did place rather significant restrictions on his ability to stand, walk, sit, or bend continuously . . ." (pl. reply 3). On August 19, 2005, at the request of the Commissioner, the plaintiff underwent a consultative examination by Dr. Eline, who did not report any alcohol use and indicated the plaintiff had been sober for seven months. Dr. Eline found the plaintiff should "be restricted from standing for greater than 20 minutes, continuous sitting for more than 20 minutes, continuous lifting more than 20 pounds, or walking more than 20 minutes continuous." The plaintiff denied back pain and had a full range of motion in his cervical and lumbar spine, no deformities or malalignment in his cervical spine, and no tenderness to palpation in the lower back. X-rays demonstrated a well-positioned, well-aligned left total hip replacement and arthroplasty; no evidence of any loosening, subsidence, or malposition; no heterotropic ossification; symmetric limb lengths with no shortening or over lengthening. He opined that the plaintiff's "hip looks great" and noted that the plaintiff did not appear to have any complications from his hip replacement. Dr. Eline concluded that the plaintiff could engage in sedentary to light activities (Tr. 694-96). The ALJ specifically gave "significant weight" to Dr. Eline's opinion as it was "strongly supported and consistent with the medical evidence as a whole" (Tr. 20). Accordingly, the ALJ incorporated the limitations cited by Dr. Eline in his residual functional capacity finding (Tr. 17).

As the ALJ emphasized, the plaintiff's hip necrosis, schizophrenia, and substance abuse responded effectively to treatment (*see* Tr. 18-19); and there is no evidence of any recommended treatment, medications, or limitations for the plaintiff's degenerative disc disease (*see* Tr. 19-20). After his total hip replacement surgery in October 2004 (Tr. 133-34), the plaintiff quickly progressed in physical therapy (Tr. 153) and

returned to full weight-bearing capability within weeks (Tr. 151). Although the plaintiff continued to report hip pain, subsequent x-rays and examinations revealed a stable, left hip with no complications. In August 2005, Dr. Eline, the consultative examiner who placed the most significant restrictions on the plaintiff's physical activities (pl. reply 3), found no complications from the plaintiff's hip surgery and reported that the plaintiff's hip "looked great" (Tr. 696); x-rays showed a well-positioned, well-aligned left total hip replacement and arthroplasty with no evidence of any loosening, subsidence, or malposition (Tr. 695). He therefore found that plaintiff could perform sedentary to light work, limiting his repetitive bending because of the restricted movement in his hip (Tr. 696). Again in June of 2006, the VAMC found the plaintiff's hip unchanged since surgery with no evidence of hardware failure or complication (Tr. 811-12).

Likewise, the plaintiff's reported symptoms of schizophrenia were mild and responded well to medication. Progress notes from December 14, 2004, indicated the plaintiff's thought process was goal-directed, his thought content normal, delusions absent, and hallucinations absent (Tr. 459). On December 29, 2004, the plaintiff reported that he intermittently heard voices calling his name, but these voices did not interfere with his functional abilities (Tr. 314). Dr. Ruby and Dr. Hancock concluded that while these symptoms suggested schizophrenia, they were hesitant to firmly diagnose it until they could evaluate the plaintiff in a substance-free state (Tr. 317, 571). On August 14, 2006, the plaintiff reported that his schizophrenia was not as severe (Tr. 800). He reported that he heard voices saying "help me" two to three times per week and experienced some paranoia in crowds (Tr. 797). Dr. Othersen noted that the plaintiff's symptoms responded well to Risperidone in the past and recommended restarting Risperidone at half the prior dose (Tr. 799).

The plaintiff's substance abuse problems also responded well to the outpatient treatment program at the VAMC. The plaintiff remained substance free

16

throughout the treatment program (see Tr. 312, 575, 591, 717, 763-96), and reported continued sobriety in August 2005 (Tr. 694) and August 2006 (Tr. 797).

With regard to his back impairment, the plaintiff first reported back pain in June 2006 and was diagnosed with degenerative disc disease (Tr. 812). However, no physician recommended a course of treatment, placed restrictions on the plaintiff's activities, or opined that this condition rendered him unable to work.

In addition, no treating physician opined that the plaintiff was disabled or placed significant restrictions on his activities based on any of his diagnosed impairments. Based upon the foregoing, substantial evidence supports the ALJ's finding that while the plaintiff did have severe impairments, these impairments did not preclude him from performing work that exists in significant numbers in the national economy.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the Commissioner's decision denying benefits be affirmed.

IT IS SO ORDERED.

s/William M. Catoe
United States Magistrate Judge

July 28, 2009

Greenville, South Carolina